IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

LINDA M. B.,[1]              )
                             )
         Plaintiff,          )
                             )
vs.                          )   Case No. 17-cv-1343-CJP[2]
                             )
COMMISSIONER of SOCIAL       )
SECURITY,                    )
                             )
         Defendant.          )

## MEMORANDUM and ORDER

**WILKERSON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff, represented by counsel, seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for benefits in November 2010, alleging disability beginning on June 1, 2007. (Tr. 25). After holding an evidentiary hearing, the Administrative Law Judge (ALJ) denied the application for benefits in a decision dated January 10, 2013. (Tr. 25-31). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies were exhausted and a timely complaint was filed in this Court.

On May 28, 2015, United States Magistrate Judge Clifford J. Proud reversed

---

[1] In keeping with the Court's recently adopted practice, plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c) and Administrative Order No. 240. See, Docs. 13, 34.

the ruling of the ALJ and remanded to the Commissioner for rehearing and reconsideration of the evidence. After holding an evidentiary hearing, the ALJ denied the application for a second time in a decision dated December 4, 2015. (Tr. 405-418). Administrative remedies were exhausted and a timely complaint was filed in this Court.

On December 5, 2016, in response to a Joint Stipulation to Remand, Senior United States District Judge J. Phil Gilbert reversed the ruling of the ALJ and remanded to the Commissioner for rehearing and reconsideration of the evidence. After holding an evidentiary hearing, the ALJ denied the application for a third time on August 15, 2017. (Tr. 727-739). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ did not adhere to SSR 96-8p when he misstated and ignored evidence in his residual functional capacity (RFC) determination for claimant.

2. The ALJ did not adhere to SSR 16-3p when he failed properly assess claimant's subjective allegations.

## Applicable Legal Standards

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). To determine whether a plaintiff is disabled,

the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work? 20 C.F.R. § 416.920(a)(4).

An affirmative answer at either step 3 or step 5 leads to a finding that the plaintiff is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any step, other than at step 3, precludes a finding of disability. *Ibid.* The plaintiff bears the burden of proof at steps 1–4. *Ibid.* Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy. *Ibid.*

### **The Decision of the ALJ**

The ALJ followed the five-step analytical framework described above. He determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date. The ALJ found that plaintiff had severe impairments of diabetes, hypertension, obesity and lumbar spinal degenerative disc disease.

The ALJ found that plaintiff had the RFC to perform work at the sedentary exertional level, limited to no climbing of ladders, ropes, and scaffolds; occasional climbing of ramps and stairs; occasional stooping, crouching, crawling, and kneeling; and no exposure to unprotected heights or dangerous machinery. Based on the testimony of a vocational expert (VE), the ALJ concluded that plaintiff was

able to do her past work, which was sedentary.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff, focusing on the relevant period from June 1, 2007, her alleged onset date, to December 31, 2011, the date last insured.[3]

1.   **Agency Forms**

Plaintiff was born in 1953 and was almost 45 years old on the alleged onset date of June 1, 2007. (Tr. 131). Plaintiff had completed three years of college. (Tr. 136). She worked as a data entry clerk from 1999 through August 2006, and as a receptionist at a hospital for two months in 2006. (Tr. 146). She indicated that she was unable to work because of several problems including back problems, diabetes, irritable bowel syndrome, neuropathy, anxiety, and panic attacks. She was 4'11" and weighed 199 pounds. (Tr. 135). She stopped working in October 2006 because of her condition. (Tr. 135). A prior claim for DIB was denied on October 6, 2008. (Tr. 132).

Plaintiff submitted a function report in April 2011, complaining of back pain and sciatic pain from sitting or standing for long periods. She stated she did not have a lot of stamina and had sudden bouts of diarrhea. She claimed her nerves were bad and she got "flustered" in stressful, busy situations. (Tr. 158). She admitted preparing a meal about once a week and occasionally doing laundry and

---

[3] An individual is only entitled to DIB if she was "under a disability" within the meaning of the Social Security Act by the date her insured status expired. 20 C.F.R. §§ 404.131(a), 404.320(b)(2); *Pepper v. Colvin*, 712 F.3d 351, 354, 369 (7th Cir. 2013).

dishes. She said her husband did most of the meal preparation and helped her with laundry and dishes. She also admitted shopping for groceries every 8 to 10 days. She alleged problems with memory, concentration, following instructions, and completing tasks. She stated that if she did too much in one day, she had to spend the next day resting in bed. (Tr. 158-165).

In a report submitted in July 2011, plaintiff said that her medications caused dizziness and drowsiness. She claimed she felt fatigued all the time and had sleep problems. She alleged her memory and concentration were "not good anymore to do office work." She stated she became very anxious in stressful situations and had "sudden uncontrollable diarrhea without warning" related to irritable bowel syndrome. (Tr. 179).

2. **Evidentiary Hearing**

Plaintiff testified that she was married and had no children under the age of 18. (Tr. 40, 430-431). She had worked in 2006 as an intake receptionist at a medical clinic. Before that, she did computer data entry work for about 7 1/2 years. (Tr. 40-42, 433, 436).

She had used a cane to walk, although she did not use one at the time of the hearing. She testified that she was doing better, but was not "all better." (Tr. 45). A cardiologist, Dr. Falcone, recommended that plaintiff have a cardiac catheterization procedure, but she had not had it done because of problems with her husband and her father. (Tr. 46-48). Plaintiff stated that she had intermittent flaring in her back and low back pain when she was working. (Tr. 439, 449). She stated she would need to get up and walk around every 10 to 15

minutes. (Tr. 448). Plaintiff took medication for IBS, prescribed by her primary care physician, but did not see a specialist. (Tr. 50-51). She said the medication was not very effective. (Tr. 438). She had not seen a mental health provider because she did not "get much of anything done except visiting my dad in the nursing home." (Tr. 51). She also had long standing sleep problems and fatigue. (Tr. 440, 446-447). Some of plaintiff's testimony concerned her condition at the time of the hearing, which took place after her date last insured. She said she had pain in her back radiating into her right leg and had headaches. She took Vicodin for pain in her knees. (Tr. 58-61).

A VE also testified. She said that plaintiff's past work as a data entry clerk was semi-skilled and sedentary. The ALJ asked her to assume a person of plaintiff's age and work experience who could do work at the light exertional level, limited to occasional stooping, kneeling, crouching, crawling and climbing stairs; no climbing of ladders, ropes or scaffolds; and no work at unprotected heights or around dangerous machinery. The VE testified that this person could do plaintiff's past work as a data entry clerk and as an admissions clerk. (Tr. 63-64, 453). Changing the hypothetical to sedentary exertional level with the same added limitations, the VE testified that this hypothetical person could do plaintiff's past work. (Tr. 453-454). Related to plaintiff's IBS, plaintiff's counsel then asked about the light exertional hypothetical, adding that plaintiff would once a month, on a daily basis for a week, need two extra unscheduled breaks. The VE testified that this hypothetical person would be unable to work any job with this restriction. (Tr. 455-456).

### 3. Medical Records

Plaintiff was seen by Dr. Cheryl Emmons, her primary care physician, in November 2007 to follow up on her diagnoses of diabetes, hypertension, and mood. Plaintiff complained of pain shooting down right leg posteriorly along with numbness and weakness. Upon examination, she had a slightly slow gait. She had no edema. She had negative straight leg raise, but Dr. Emmons noted that any movement seemed to cause her discomfort. (Tr. 650). A lumbar spine MRI showed moderate right L5-S1 neural foraminal narrowing with disc protrusion causing mass effect on the right S1 nerve root and lateral recess. There was also moderate left and right neural foraminal narrowing at L4-L5 and mild central canal stenosis due to annular disc bulge with asymmetric left foraminal component. (Tr. 651). Dr. Emmons prescribed Celebrex and Tylenol No. 3 (Tylenol with codeine), which she continued to take through at least January 2008. (Tr. 650, 280).

Plaintiff was seen by Dr. Don Kovalsky at the Orthopedic Center of Southern Illinois in January 2008, on a referral from Dr. Cheryl Emmons. Plaintiff complained of pain in her low back and right buttocks and leg pain. She was unemployed secondary to pain and a history of depression. She walked with an antalgic gait and had been using a cane to ambulate for the past year. On exam, she had lumbar muscle spasms and positive straight leg raising on the right. She had "pain to some degree out of proportion to her findings. . . ." A lumbar MRI was done. She had "what appears to be a right-sided contained disc herniation at L5/S1 with posterior displacement of the S1 nerve root." The doctor's impression was longstanding degenerative disc disease with a probably sub-acute right-sided

disc herniation at L5/S1 causing right lumbar radiculopathy. He also observed plaintiff's antalgic gait, pain in the lumbosacral region, mild to moderate lumbar muscle spasms, and markedly restricted lumbar function. The doctor determined that plaintiff was a poor candidate for surgery because of her weight, history of depression, and diabetes. He recommended a trial of conservative treatment and prescribed Vicodin and Ultram for pain. (Tr. 280-281).

Plaintiff was seen at Rea Clinic in February 2009. Her past medical history included herniated discs, IBS, diverticulitis, anxiety, and depression. The assessment was Type II diabetes, poorly controlled, high blood pressure, IBS, and depression. There was edema and numbness in her extremities. She was prescribed medication for these conditions, including Celexa for depression. (Tr. 230). On February 26, 2009, she was prescribed Neurontin for neuropathy in her right lower extremity. (Tr. 229). In March 2009, her numbness and pain were better on Neurontin. (Tr. 228). In August 2009, plaintiff had episodes of edema. (Tr. 224-225).

In September 2009, plaintiff was seen at Rea Clinic for chest pain and edema, although it appears from the note that her edema had decreased. She was to have a cardiology consult. (Tr. 223). In December 2009, her chest pain and shortness of breath had improved. (Tr. 221). She came in to have her medications refilled in October 2010. She was to continue taking Celexa for depression. (Tr. 219). In November 2010, P.A. Starkey noted that plaintiff was "maxed" on oral diabetes medications, but she declined starting on insulin because her husband did not want her to. (Tr. 218). In December 2010, it was noted that she had depression and

anxiety. She was walking her dog 10 blocks daily. (Tr. 217).

Plaintiff continued to be seen at Rea Clinic through 2011. (Tr. 341-381, 399-401). She complained of headaches, bloody stool, and ongoing pain in her right thigh. P.A. Starkey noted that her "chronic problems" included diverticulitis, diabetes, and depression. (Tr. 358). She was described as "chronically ill-appearing." There was no edema in her extremities. She indicated that she was sleeping more than 15 hours at a time, several times a week. (Tr. 360).

In July 2012, plaintiff was seen at Rea Clinic for chest pain. She was again described as "chronically ill-appearing." A stress test was normal. She was referred for a cardiac evaluation. (Tr. 345-349). She was seen at Prairie Cardiovascular in August 2012. Her stress test showed no evidence of reversible ischemia. The doctor discussed the possibility of a cardiac catheterization, but plaintiff did not want to consider it as her symptoms had improved. She was given a prescription for nitroglycerin. The diagnoses were chest pain (not otherwise specified), shortness of breath, hypertension, Type II diabetes, obesity, coronary artery disease and hypothyroidism. (Tr. 332-333).

### 4. Consultative Examinations

On March 14, 2011, Dr. Adrian Feinerman performed a consultative physical examination at the request of the agency. Dr. Feinerman reported that plaintiff had no redness, warmth, thickening, effusion, or limitation of movement of any joint. Grip strength was strong and equal. She walked normally without an assistive device. She had crepitation of both knees. Muscle strength was normal throughout with no spasm or atrophy. Fine and gross manipulations were

normal. The range of motion of the spine was full. Straight leg raising was negative. Sensory examination was normal. She was 4'11" tall and weighed 211 pounds. (Tr. 240-248).

James Peterson, Ph.D., performed a consultative psychological exam on March 14, 2011. Plaintiff was taking Celexa for anxiety and depression. She reported chronic worrying and symptoms of OCD. She also reported pressured speech, and Dr. Peterson observed that she spoke rapidly and perseverated.[4] Dr. Peterson diagnosed generalized anxiety disorder and obsessive-compulsive disorder. He noted that she "did not describe symptoms of depression that were clinically significant." (Tr. 251-253).

Dr. John Coe performed a consultative physical examination on August 18, 2011. Plaintiff had pain behind the right patella and tenderness in the lumbar spine. Her gait was normal and she was able to get on the examining table but had difficulty getting off of it because of her weight. Straight leg raising was negative. The range of motion of the back was almost full. She had decreased sensation along her lower lateral right leg with reduced patellar and ankle reflexes. The diagnoses were severe obesity, diabetes, hypertension, back pain with past nerve injury, and irritable bowel syndrome. (Tr. 291-299).

Fred Klug, Ph.D., performed a consultative psychological exam on August 24, 2011. Dr. Klug reported that plaintiff's immediate, short term, and long term memory were intact. Attention and concentration were adequate. Reasoning and

---

[4] Perseveration is "An inability to switch ideas along with the social context, as evidenced by the repetition of words or gestures after they have ceased to be socially relevant or appropriate." http://psychcentral.com/encyclopedia/2008/perseveration/, visited on May 27, 2015.

abstract thinking were fair, and judgment and insight were poor. Expressive language was good with adequate volume and rate. She did not have any idiosyncratic use of words. Her thought processes were circumstantial and production was overabundant. She had "a lot of social anxiety." She did not experience obsessions, but she did say that she had a "mild hoarding problem." Dr. Klug noted that her affect was tearful and consistent with her thought content, and that she "reported feeling depressed most of the time for the last 20 years." His diagnoses were social phobia, dysthymic disorder-late onset, generalized anxiety disorder, rule/out post-traumatic stress disorder. (Tr. 303-307).

**5. State Agency RFC Assessments**

In September 2011, a state agency physician assessed plaintiff's physical RFC based on a review of the medical records. He concluded that she could do medium work, limited to no climbing of ladders, ropes, or scaffolds, and only occasional climbing of ramps and stairs. (Tr. 322-329).

Another state agency consultant completed a Psychiatric Review Technique form stating that plaintiff did not have a severe mental impairment. (Tr. 308-320).

## Analysis

Plaintiff argues that the ALJ ignored and misstated evidence in his RFC findings that would undermine his conclusion. In assessing a plaintiff's RFC, an ALJ must consider all relevant evidence in the case record and evaluate the record fairly. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); 20 C.F.R. § 404.1545 (a)(1) and (3). While the ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to his

findings. *Ibid.* (citing *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001) and *Zurawski v. Halter,* 245 F.3d 881, 888 (7th Cir. 2001)). Otherwise, it is impossible for a reviewing court to make an informed review. *Golembiewski,* 322 F.3d at 917 (citing *Smith v. Apfel,* 231 F.3d 433, 438 (7th Cir. 2000)). While plaintiff's accusations that the ALJ ignored evidence of her antalgic gait, lumbosacral pain, mild to moderate muscle spasms, positive straight leg test, and markedly restricted motion are factually incorrect, other facets of plaintiff's argument sufficiently hit their mark.

First, the ALJ ignored and misstated medical findings that were not consistent with his determination. In 2009, plaintiff's medical history revealed edema for at least a couple of months, covered in several medical visits at the Rea Clinic, that the ALJ did not discuss at all. Oddly, the ALJ repeated findings in notes from other visits that found no edema. He also did not discuss positive bowstring and Valsalva tests from an earlier visit to an orthopedic doctor that were consistent with right lumbar radiculopathy. Nor did he discuss tenderness in the sciatic notch from the same visit. (Tr. 280). More importantly, though, the ALJ incorrectly stated that plaintiff "has not required narcotic pain medications regularly from 2007 through 2011, and she has only received very conservative treatment for her pain." (Tr. 735). To the contrary, plaintiff's primary care physician prescribed narcotic pain medication to plaintiff at least twice before referring her to an orthopedist that prescribed plaintiff another narcotic pain medication.

Second, the ALJ left out imaging evidence when reporting MRI results in his

decision.  Regarding plaintiff's lumbar spine MRI in October 2007, the ALJ stated that it "demonstrated moderate right L5-S1 neural foraminal narrowing with disc protrusion causing mass effect on the S1 nerve root.  There was also moderate neural foraminal narrowing at L4-L5."  However, the ALJ left out that the MRI additionally revealed "mild central canal stenosis due to annular disc bulge with asymmetric left foraminal component."  (Tr. 651).

Looked at singularly, these pieces of evidence are likely not fatal.  However, when the evidence is looked at together, a pattern does emerge.  It appears that the ALJ left some evidence out that corroborated plaintiff's claims to increase the plausibility of her conclusion.  This Circuit has rejected that approach.  See, *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).

"If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required."  *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (internal citation omitted).  Because remand is required for errors in the ALJ's weighing of the opinion evidence, the Court need not address plaintiff's remaining argument regarding subjective symptom allegations.  Reconsideration of plaintiff's credibility will require a fresh look.

The Court will point out as a final note, however, that while the ALJ concluded that the objective medical evidence indicated that plaintiff's impairments could reasonably be expected to cause his alleged symptoms, he also concluded that plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  The Seventh Circuit has called

decision.  Regarding plaintiff's lumbar spine MRI in October 2007, the ALJ stated that it "demonstrated moderate right L5-S1 neural foraminal narrowing with disc protrusion causing mass effect on the S1 nerve root.  There was also moderate neural foraminal narrowing at L4-L5."  However, the ALJ left out that the MRI additionally revealed "mild central canal stenosis due to annular disc bulge with asymmetric left foraminal component."  (Tr. 651).

Looked at singularly, these pieces of evidence are likely not fatal.  However, when the evidence is looked at together, a pattern does emerge.  It appears that the ALJ left some evidence out that corroborated plaintiff's claims to increase the plausibility of her conclusion.  This Circuit has rejected that approach.  See, *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).

"If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required."  *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (internal citation omitted).  Because remand is required for errors in the ALJ's weighing of the opinion evidence, the Court need not address plaintiff's remaining argument regarding subjective symptom allegations.  Reconsideration of plaintiff's credibility will require a fresh look.

The Court will point out as a final note, however, that while the ALJ concluded that the objective medical evidence indicated that plaintiff's impairments could reasonably be expected to cause his alleged symptoms, he also concluded that plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  The Seventh Circuit has called

this language "even worse" than "meaningless boilerplate."  See *Bjornson v. Astrue,* 671 F.3d 640, 645–46 (7th Cir. 2012); see also *Brindisi v. Barnhart,* 315 F.3d 783, 787–88 (7th Cir. 2003).   On remand, the ALJ should be more vigilant in addressing this issue as well.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff was disabled during the relevant period, or that he should be awarded benefits.  On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   May 9, 2019.**

*[signature: Donald Wilkerson]*

**DONALD G. WILKERSON**
**UNITED STATES MAGISTRATE JUDGE**